KUSKIN, J.T.C.
Plaintiff appealed the 2006 and 2007 local property tax assessments on its property in the Township of Berkeley Heights. The property consists of 195.7 acres of land and 25 buildings containing, in the aggregate, approximately two million square feet of floor area used primarily for office and laboratory purposes. Based on my determination that plaintiff did not respond properly to requests for information served by defendant’s tax assessor pursuant to N.J.S.A. 54:4-34,[1] I granted defendant’s motions for *300 relief under this statute with respect to both years under appeal.[2] Plaintiff then requested a reasonableness hearing pursuant to Ocean Pines Ltd. v. Borough of Point Pleasant, 112 N.J. 1, 547 A.2d 691 (1988).
Before the scheduled date for the healing, both parties moved to have the issues decided based on certifications, without testimony. I denied both motions and conducted a hearing at which witnesses were presented. Based on: (1) the testimony and exhibits presented at the reasonableness hearing, (2) the certifications submitted in connection with the motions preceding the hearing, (3) the transcripts of the depositions of defendant’s assessors[3] who determined the 2006 and 2007 assessments, and (4) my evaluation of the credibility of the witnesses who testified, I conclude, for the reasons set forth below, that defendant’s assessors acted reasonably for each of the tax years in issue. Consequently, I will enter judgments dismissing plaintiffs appeals, thereby affirming the assessments on the subject property for tax years 2006 and 2007.
I
I make the following factual findings. For tax year 1999, defendant conducted a municipal-wide revaluation, resulting in an assessment on the subject property in the total amount of approximately $220,000,000. For tax year 2003, plaintiff negotiated with defendant’s then tax assessor a reduction in the assessment to a total of $160,800,000. During 2003, defendant changed assessors. During 2004 or early 2005, the new assessor, Patricia Spyehala, made a one-hour inspection of the property while escorted by plaintiffs property tax manager. Plaintiff attempted to negotiate a further reduction in the assessment for tax year 2005, but Ms. *301 Spychala refused to make any adjustment because she was not convinced that any changes had occurred at or with respect to the subject property which warranted a reduction beyond that made for tax year 2003. For tax year 2006, as a result of a decline in defendant’s Chapter 123 Ratio [4] 5from the 2003 ratio, Ms. Spychala reviewed the assessment on the property. She was concerned that the ratio decline resulted in an assessment that reflected an excessive increase in the equalized value of the property.[5]
In conducting the review, Ms. Spychala did not inspect the subject property, nor did she make an independent determination of land or improvement value or otherwise prepare an independent valuation of the property. In determining the 2006 assessment, she focused on the total value of the property. Before setting the assessment, she discussed with the municipal appraisal expert the property’s value and the ratio decline. The appraiser recommended that the assessment reflect an equalized value of approximately $239,000,000, representing a slight increase over the 2005 equalized value of approximately $236,000,000. Ms. Spychala kept no notes of her discussions with the appraiser and did not know what information he relied on in making his recommendation.
In reliance on the appraiser’s recommendation, Ms. Spychala reduced the 2006 assessment on the subject property to $149,410,500 (an equalized value of $239,363,185 multiplied by defendant’s 2006 Chapter 123 Ratio of 62.42%). In allocating the assessment between land and improvements, she maintained the 2003, 2004, and 2005 land assessment in the sum of $33,410,500 and reduced the improvements assessment to $116,000,000. The *302 total assessment, as reduced, constituted approximately eight percent of the total tax ratables in Berkeley Heights.
In February 2006, defendant engaged a new assessor, Stan Belenky. Upon assuming his responsibilities, he reviewed all files relating to pending tax appeals, including the file relating to the subject property and the pending appeals for tax years 2005 and 2006. For purposes of determining the 2007 assessment on the subject property, he did not inspect the property, nor did he make any independent effort to value the land or improvements or to determine the overall value of the property. In setting the 2007 assessment, Mr. Belenky reviewed the 1999 revaluation assessment, relied on documents in the assessor’s file, discussed with his predecessor, Ms. Spyehala, the reduction she granted for tax year 2006, and consulted with the municipal appraisal expert (the same expert consulted by Ms. Spyehala with respect to the 2006 assessment).
One document in the file that was of particular significance to Mr. Belenky was an appraisal of the subject property by Thomas Welsh, MAI, dated April 14, 1995 that was performed at defendant’s request and determined a value for the property as of October 1, 1993 of $290,000,000, or approximately $151 per square foot for 1,915,273 square feet of rentable area. The other documents in the file that Mr. Belenky considered to be significant were sketches of the subject buildings and notes prepared by defendant’s then assessor in connection with the 2003 assessment reduction, an engineering report, and floor plans. The notes contained a calculation of the gross floor area of the subject improvements as 2,042,285 square feet.[6]
Based on his examination of the file for the subject property, Mr. Belenky determined that the gross floor area of the subject buildings was approximately 2,050,000 square feet. In order to verify the building area, he consulted with the municipal appraiser who advised him that the area was approximately 2,100,000 square *303 feet. Mr. Belenky did not know the basis for the appraiser’s knowledge of building area.
Mr. Belenky concluded that the data in the file, as confirmed by his conversation with the municipal appraiser, provided a reasonable basis for determining the appropriate square footage for assessment purposes for tax year 2007, and that measurement of the subject buildings was not necessary. In setting the 2007 assessment at the same amount as the 2006 assessment, that is, $149,410,500, he was concerned only with the overall value of the property. He described that concern in his deposition as follows:
My concern with [the] subject property was that $149,410,500 is a reasonable, fair, and equitable assessment. By looking at all data available to me as of October 1, 2006,1 established that [the] equalized assessed value of $130 per square foot was [a] reasonable assessment for [the] subject property.
In concluding that $130 per square foot was reasonable, Mr. Belenky considered the $107 per square foot valuation established as of October 1, 1998 in connection with the revaluation for tax year 1999, the $151 per square foot valuation as of October 1,1993 set forth in the Welsh appraisal, as well as appreciation in the market. Mr. Belenky was aware that, at or around October 1, 2006, warehouse buildings were selling at $100 per square foot and office buildings were selling at $200 per square foot. He concluded that the subject buildings, containing a combination of office and laboratory space, fit within the bracket established by the warehouse and office building sales.
Mr. Belenky testified at his deposition that maintaining assessments from year to year was standard assessing practice unless the property underwent a physical change, economic conditions changed, or the legal restrictions governing the property changed. He had no reason to believe that any such changes had occurred between October 1, 2005 and October 1, 2006. Based on the applicable Chapter 123 Ratio for 2007 of 55.97%, the assessment of $149,410,500 reflected an equalized value of $266,947,472 or $130.32 per square foot for 2,050,000 square feet of gross building area.
*304 II
Plaintiff contends that: (a) the information on which defendant’s assessors relied in determining the assessments for tax years 2006 and 2007 was faulty and did not provide a reasonable basis for determining the value of the subject property for either year, and (2) the methodology employed in determining the assessments was flawed and unreasonable. In support of these contentions, plaintiff presented the testimony of Thomas Welsh, the appraiser who had prepared the valuation report in the assessor’s file. Mr. Welsh testified that the assessors acted unreasonably in the following respects:
1. Each assessor failed to undertake an independent investigation for purposes of verifying- the accuracy of the information contained in the assessor’s files;
2. Each assessor failed to perforin an independent valuation analysis of the subject property by using- one of the three generally accepted approaches to value, that is, the sales comparison approach, the income approach, or the cost approach;
3. Each assessor relied on reports prepared by others without updating the information contained in the reports; and,
4. Each assessor failed to keep notes with respect to her or his conversation with the appraiser for the municipality.
In cross-examination, Mr. Welsh acknowledged that, although he had served as the appraisal expert or consultant for various municipalities, he was not a certified tax assessor nor had he taken any courses relating to property tax administration. His opinions as to unreasonable procedures and data were based on his expertise as an appraiser. Mr. Welsh also acknowledged that, in fact, the gross floor area of the buildings at the subject property was approximately 2,100,000 square feet as of the assessing dates in issue, October 1, 2005 and October 1, 2006, and that, under some circumstances, an assessor may rely on information provided by others without further verification. His concern with respect to the reliance by defendant’s assessors on information and recommendations from the municipal appraiser was that he could not determine the bases for the information and recommendations provided by the appraiser because the assessors did not keep notes of their respective conversations with the appraiser. Finally, Mr. Welsh acknowledged that, if an assessor has no information concerning physical changes in a property, reliance by the *305 assessor on revaluation measurements would be reasonable. Mr. Welsh did not testify as to any changes in the area of the subject buildings between the October 1, 1993 valuation date for his appraisal contained in the assessor’s file and either the valuation date for the revaluation, October 1, 1998, or the valuation dates of October 1, 2005 and October 1, 2006 for the 2006 and 2007 assessments, respectively. Plaintiff did not present other evidence that any such changes had occurred.
In support of the reasonableness of the assessing practices followed by defendant’s assessors for tax years 2006 and 2007, defendant relied on the assessors’ respective deposition testimony, on a certification from Mr. Belenky, the assessor for tax year 2006, and the testimony of Denise Siegel, an independent certified tax assessor who was qualified as an expert witness on assessing practices in New Jersey. Ms. Siegel has been an assessor since 1990. She has taught property tax administration, including preparation of tax lists, to prospective assessors in courses provided by Rutgers University. Those courses “are recommended as preparation for the [assessor’s] certification exam.” New Jersey Division of Taxation, Handbook for New Jersey Assessors. § 104.15 (1989, partially revised 1998). She acknowledged that she had not done tax appeal appraisals other than in her capacity as assessor, that is, she had not acted as an independent valuation expert for municipalities in which she was not the assessor.
Ms. Siegel testified that Mr. Welsh, in his testimony, had confused an assessor’s responsibilities to prepare an annual tax list with the responsibilities of a real estate appraiser obligated to comply with the requirements of the Uniform Standards of Professional Appraisal Practice (“USPAP”) developed by the Appraisal Standards Board of The Appraisal Foundation. She was aware that sections 301.1(4) and 501.1 of the Handbook for New Jersey Assessors, supra, state that assessments should be based on appraisals, and that the Real Property Appraisal Manual for New Jersey Assessors describes an appraisal as “the base for an assessment.” New Jersey Division of Taxation, I Real Property Appraisal Manual for New Jersey Assessors 1-29 (3rd ed.). She testified that these sections related to situations where a property *306 had not previously been assessed or where significant changes had been made in the property and that the sections were not applicable to circumstances where the assessor had no knowledge of, or reason to believe that, material changes had occurred affecting the valuation or appropriate assessment of an existing, previously assessed, property.
In Ms. Siegel’s opinion, if an assessor were required to make annual independent investigations and verifications of all information in the assessor’s files, and prepare annual valuation analyses for every property in the municipality, the assessor’s task would be impossible to perform. She stated that, in order for assessors to be able to perform their responsibilities on an annual basis, they must and should rely on information developed by predecessor assessors. She described as reasonable assessing practices (1) the reliance by each of defendant’s assessors on information provided by the municipal appraiser and (2) the focus of the assessors on the total value of the subject property without particular concern as to the separate value of the land and the improvements.
Ms. Siegel characterized, as a standard assessing practice, the maintaining of property assessments from year to year in the absence of specific evidence of a change in circumstances that would affect the value of the property. She also described the general practice of assessors in using a procedure known as base year assessing. Under this procedure, the assessment established by a revaluation is maintained from year to year subject to adjustments necessitated by physical changes to the property and changes in the Chapter 123 Ratio applicable to the municipality. Ms. Siegel testified that she teaches base year assessing to prospective assessors in the Rutgers University property tax administration course. She stated that, except for circumstances in which a property is newly improved or has changed in a material respect, it is appropriate and reasonable for an assessor to carry assessments from year to year’ without doing a new appraisal of land, improvements, or overall value, and without reinspecting and remeasuring building areas.
*307 Ms. Siegel testified that defendant’s assessors did “what they needed to do” for tax years 2006 and 2007. She further testified that the assessors acted reasonably in not investigating in detail the reductions in plaintiffs assessment that had been granted for tax years 2003 and 2006 and acted reasonably in not documenting their respective conversations with the municipal appraiser. She considered the data upon which defendant’s assessors relied and their procedures in establishing the assessments for tax years 2006 and 2007 as adequate and reasonable.
Ill
The decisional law discussing what constitutes “reasonable” assessing practices is limited. The leading relevant case is Ocean Pines Ltd. v. Borough of Point Pleasant, supra, 112 N.J. 1, 547 A.2d 691. There, our Supreme Court set forth the consequences of a taxpayer’s failure to respond to an assessor’s request for information pursuant to N.J.S.A 54:4-34. The statute provides that, if a taxpayer does not respond properly, in a timely manner, to the assessor’s request, “the assessor shall value [the taxpayer’s] property at such amount as [the assessor] may, from any information in [the assessor’s] possession or available to [the assessor], reasonably determine to be the full and fair value thereof.” Based on the statute’s requirement that the assessor’s determination be reasonable, the Court held that, even in the absence of a timely proper response to a Chapter 91 request, a taxpayer retains the right, under the statute, to a hearing to determine the reasonableness of the assessment imposed by the assessor. As described by the Court, at such a hearing:
[t]he inquiry will focus solely on whether the valuation could reasonably have been arrived at in light of the data available to the assessor at the time of valuation. Encompassed within this inquiry are (1) the reasonableness of the underlying data used by the assessor and (2) the reasonableness of the methodology used by the assessor in arriving at the valuation [Id. at 11, 547 A2d 691.]
The following presumption is applicable in the hearing:
The original assessment is entitled to a presumption of validity, e.g., Pantasote Co. v. City of Passaic, 100 N.J. 408, 412 1495 A.2d 13081 (1985), and in order to overcome that presumption, the taxpayer must produce evidence that is definite, positive and certain in quality and quantity____ (An example of an aberrant *308 methodology that dispelled the presumption of correctness of the local assessment may be found in Transcontinental Gas Pipe Line Corp. v. Bernards Township, 111 N.J. 507 [545 A.2d 746] (1988) (the assessor valued the property to produce the same revenue as the prior assessment yielded).)
LId. at 12, 547 A.2d 691 (citation and internal quotation marks omitted).]
A reasonableness hearing, as described and defined in Ocean Pines, does not include plenary proofs as to the value of the property under appeal but only proofs as to whether the assessment imposed by the assessor was reasonable “in light of the data available to the assessor at the time of valuation.” Id. at 11, 547 A.2d 691. Because of the limited scope of the hearing, I interpret the reference in the foregoing quotation to the presumption of validity of the original assessment to mean that, in the context of a reasonableness hearing, the data upon which the assessor relied and the assessor’s methodology are presumed to have been reasonable. The taxpayer, therefore, has the burden to produce evidence that is “definite, positive and certain in quality and quantity” in order to overcome that presumption. .
In Pantasote Co. v. City of Passaic, 100 N.J. 408, 495 A.2d 1308 (1985), cited in the above quotation from Ocean Pines, our Supreme Court not only articulated the nature of the presumption of validity but also provided an example of what is required to overcome the presumption in the context of allegations that an assessor acted unreasonably in imposing an assessment. In Pantasote, the tax assessor established an assessment for tax year 1979 by adjusting the assessment imposed for 1978 which was the result of a settlement of lengthy litigation between the parties. For 1980 and 1981, the assessor added to the 1979 assessment a ten percent time adjustment intended to reflect general increases in property values for industrial properties. He based the adjustment on sales in the area. In affirming a Tax Court determination that the plaintiff had failed to present, at a plenary trial, proofs of value sufficient to overcome the presumption attaching to the 1979, 1980 and 1981 assessments placed on the property under appeal, the Court stated:
While the assessment methodology of the tax assessor was incorrect, it was not arbitrary or capricious. Moreover, the amount of the assessment was reasonably related to property values that could have otherwise been reached by an appliea *309 tion of sound assessment approaches, and, further, the assessment appears to be a reasonable approximation of true value. The Tax Court, under these circumstances, properly applied the presumption of validity to the assessment, and soundly concluded that the taxpayer had failed to overcome that presumption by sufficient evidence.
[hi. at 417,495 A.2d 1308.]
In addition to its reference to Pantasote, the Supreme Court in the above quotation from Ocean Pines referred to its decision in Transcontinental Gas Pipe Line Corp. v. Bernards Township, 111 N.J. 507, 545 A.2d 746 (1988). Among other issues addressed in the Transcontinental Gas Pipe Line case was the contention that the assessor’s methodology in establishing the 1983 assessments on Transcontinental’s property and the property of another pipeline company was sufficiently flawed so that no presumption of validity should attach to either assessment. As described by the Court, in setting the 1983 assessments on the properties in the context of a municipal-wide reassessment,
[the assessor’s] primary consideration was to establish a value that would yield substantially the same tax dollars at the Township’s new tax rate as had been yielded in the previous year under the old tax rate. Since other property in the Township had been assessed, on average, at approximately three times its 1982 value due to the 1983 revaluation, the assessor essentially tripled the pipelines’ 1982 assessment and worked backwards to determine replacement cost and appreciation figures.
[Id. at 515, 545 A.2d 746.]
The Court reiterated the standard it established in Pantasote with respect to the presumption of validity as follows:
In Pantasote wo interpreted [the evidential standard applicable to overcoming the presumption of validity attaching to an assessment] to mean that the presumption remained in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity.
[Id. at 517, 545 A.2d 746 (citation omitted).]
After examining the record, the Court determined that the pipeline companies had not presented, in a plenary trial, sufficient credible evidence concerning value so as to overcome the presumption of validity attaching to the original assessment. The Court then stated as follows:
Normally, this determination would end our inquiry. However, taxpayers allege that the method of assessment utilized by the municipality was so patently *310 defective and aberrant as to justify removal of the presumption of validity. We agree with taxpayers that the methodology utilized in the original assessment manifested an arbitrary or capricious discharge of the assessor’s responsibilities. We determine that, when confronted by such a totally deficient valuation methodology, which prorides no reliable indication that the quantum of the assessment is itself reasonable, the Tax Court is obligated to exercise its power to make an independent assessment based on the evidence before it and data properly at its disposal.
The flaws in the original assessment methodology were exposed during the deposition of the assessor who prepared it. Confronted noth the difficulty of applying other valuation approaches to taxpayers’ property, the assessor simply calculated the value of the property necessary to produce approximately the same tax dollars at the Township’s new tax rate as it had the previous year under its old tax rate. The assessor thus made no attempt to determine the rate at which taxpayers’ property appreciated in relation to the increase in value of other kinds of property in the Township. Without evidence that all lands of property in the Township, whether it be residential, commercial or industrial, appreciated at the same rate, and that pipeline property was comparable to these other types of property, such an assumption was improper.
[Id. at 537-39, 545 A.2d 746 (citations and footnote omitted).]
IV
Plaintiff relies on the holding of, and quoted language from, Transcontinental Gas Pipe Line in arguing that the methodologies used by defendant’s assessors in establishing the 2006 and 2007 assessments on plaintiffs property were so arbitrary and capricious as to be unreasonable under the Ocean Pines standard, and, consequently, that plaintiff is entitled to a plenary valuation hearing as to each year under appeal. Specifically, plaintiff contends that defendant’s assessors made no effort to determine the value of plaintiffs property or the proper rate of appreciation applicable to the property as compared with the rate of appreciation applicable to other properties in the municipality.
In response, defendant asserts that, under the Pantasote standard, in order to defeat the presumption of validity attaching to the data upon which defendant’s assessors relied and the reasonableness of the assessors’ respective methodologies in determining the 2006 and 2007 assessments on the subject property, plaintiff must establish that the assessors acted arbitrarily or capriciously in setting the assessments. Defendant argues that the opinion of defendant’s assessment expert that the assessors acted reasonably *311 is sufficient to establish that the actions of the assessors were neither arbitrary nor capricious, that the data upon which they relied provided a reasonable basis for establishing the 2006 and 2007 assessments, and that their respective methodologies were reasonable.
Based on the authorities discussed above, I conclude that, in order to establish that the data upon which an assessor has relied was unreasonable, or that the methodology used by the assessor was unreasonable, a taxpayer must establish by evidence that is “definite, positive and certain in quality and quantity,” Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952) (quoted in Ocean Pines, Ltd. v. Borough of Point Pleasant, supra 112 N.J. at 12, 547 A.2d 691), that, in selecting the data, the assessor acted arbitrarily or capriciously or that the methodology used by an assessor was arbitrary or capricious.
Here, the proofs established that, in determining the 2006 and 2007 assessments on the subject property, defendant’s assessors used methodologies that did not include a physical inspection of the subject property, did not include any independent effort to determine the fair market value of the property, and did not include any accumulation or thorough investigation of current data from the marketplace. They relied on data appearing in the file produced or accumulated by their predecessors without verifying or updating the data and relied on information and recommendations from the municipal appraisal expert without inquiring as to the basis for the information and recommendations.
If the standards for measuring the reasonableness of the assessors’ respective processes for setting the assessments on the subject property for the years in issue were the standards applicable to appraisal of the property under USPAP or under court decisions discussing the adequacy of appraisal analyses, then the assessors’ practices would be deficient and insufficient to support an appraisal analysis and opinion as to the value of the subject property for either 2006 or 2007. See e.g., B.F. Goodrich Co. v. Township of Oldmans, 17 N.J.Tax 114 (Tax 1997), aff'd, 323 N.J.Super. 550, 733 A.2d 1204 (App.Div.1999) (criticizing and *312 rejecting the testimony of an appraisal expert because of his inadequate investigation and understanding of the facility he valued and his failure to support his valuation conclusions). However, the role of the assessor is different and distinguishable from the role of the appraiser. As defendant’s assessing expert, Ms. Siegel, testified, as a matter of practicality, an assessor cannot remeasure and re-appraise each property in the municipality each year for purposes of determining the proper assessment on that property. This practical limitation was recognized by our Supreme Court in Tri-Tenninal Carp. v. Borough of Edgewater, 68 N.J. 405, 346 A.2d 396 (1975), where the Court stated as follows:
The law calls for separate assessment of each parcel annually at its true value on the assessing date. While practicalities obviously preclude most assessors reviewing every assessment line item every year, there should nevertheless be alertness to changed valuation factors peculiarly affecting individual properties in years between revaluations and requiring prompt revision of such assessments in fairness to the particular taxpayer or to the taxing district. It should be obvious that, absent such attention, the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor’s function. [Id. at 413-14, 346 A.2d 396 (citations omitted).]
See also, New Jersey Division of Taxation, Handbook for New Jersey Assessors, supra at § 902.23.
The standard applicable in the context of a Chapter 91 hearing for purposes of determining whether an assessor acted reasonably is less stringent than the standard applicable in the context of a plenary valuation hearing for purposes of determining whether a presumption of validity attaches to an assessment. In the latter context, if a taxpayer challenges the presumption, a court may require proof that the assessor obtained and considered market data in setting the assessment. In the Chapter 91 context, however, the express language of the statute requires only that the assessor “reasonably determine” the value of a property based on “any information in [the assessor’s] possession or available to [the assessor].” N.J.S.A. 54:4-34. This limitation on the assessor’s responsibilities applies whether a particular property is 8% or .008% of the total tax base.
I am satisfied that the data upon which defendant’s assessors relied had a sufficient degree of reliability so that, when *313 coupled with the assessors’ respective conversations with defendant’s appraisal expert, the data provided a reasonable basis for assessment of the subject property even though not necessarily providing a sufficient basis for appraising the property. Similarly, the methodology employed by the assessors in setting the assessments for the tax years in issue represented a reasonable assessing practice, consistent with assessing practice generally and with the requirements of Chapter 91, even though not necessarily sufficient for performing a fair market value appraisal of the property.
As distinguished from the actions of the assessor described in Transcontinental Gas Pipe Line, defendant’s assessors did not disregard the value of the subject property or appreciation in determining the 2006 and 2007 assessments. They displayed “alertness” to valuation factors affecting the property as required in the above quotation from Tri-Terminal Corp. v. Borough of Edgewater, supra, 68 N.J. at 414, 346 A.2d 396. For tax year 2006 defendant’s assessor, Ms. Spychala, satisfied herself from the records in the assessor’s file and from consultation with the municipality’s appraisal expert that a minor increase in the equalized value of the subject property from the equalized value reflected by the 2005 assessment was appropriate and that appreciation at the rate reflected by the decline in the municipality’s Chapter 123 ratio was inappropriate. For tax year 2007, defendant’s assessor, Mr. Belenky, satisfied himself as to the area of the subject property based on information in the file and information obtained from the municipal appraisal expert. He also satisfied himself that, based on the revaluation for tax year 1999, an earlier appraisal of the subject property, the work product of his predecessors, and his personal knowledge of property values, the assessment as imposed for tax year 2006 reasonably reflected the fair market value of the subject property as of October 1, 2006, and, therefore, the same assessment could be maintained for tax year 2007. The focus of both assessors on the total value of the subject property was consistent with the well-established principle that the total assessment is the substantive concern for an assessor and the allocation of the assessment between land and im *314 provements is an administrative act. Brown v. Borough of Glen Rock, 19 N.J.Tax 366, 376 (App.Div.), certif. denied, 168 N.J. 291, 773 A.2d 1155 (2001). See also In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 33-34, 166 A.2d 763 (1961).
For the foregoing reasons, I conclude that plaintiff has failed to establish that the data upon which defendant’s assessors relied or their respective methodologies were inconsistent with, or in violation of the reasonableness requirements of Chapter 91. Consequently, I will enter judgments dismissing plaintiffs appeals for tax years 2006 and 2007 and thereby will affirm the assessments for those years.

 This statute was enacted as L. 1979, c. 91, § 1, and is commonly referred to as Chapter 91. I will use that reference interchangeably with the statutory citation.

 Defendant also filed a Chapter 91 motion with respect to plaintiff's appeal for tax year 2005. I denied the motion on the grounds that it was untimely. The Appellate Division of our Superior Court granted defendant's motion for leave to appeal from my decision. No. A-4439-07T1 (Appellate Division, argued October 20, 2008).

 Defendant had different assessors for each of tax years 2006 and 2007.

 This ratio is promulgated by the Director of the New Jersey Division of Taxation for each municipality in the State. N.J.S.A. 54:l-35a to -35c. The ratio is a critical element in the determination oí property tax appeals except as to years where the municipality has put into effect a revaluation program. M.J.S.A. 54:3-22; NJ.SA. 54:51A-6.

 Equalized value is determined by dividing the assessment on the property by the Chapter 123 Ratio for the tax year in question.

 The assessor’s file contained many additional documents including, among others, property record cards, construction permits, certificates of occupancy, Chapter 91 responses from plaintiff, and photographs of the subject property.