**NOT FOR PUBLICATION WITHOUT APPROVAL OF**
**THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



MALA SUNDAR
PRESIDING JUDGE

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

March 3, 2026

Volha Holik, Esq.
McCarter & English, LLP
Attorney for Plaintiffs

Demetrice Miles, Esq.
Chiesa Shahinian & Giantomasi, PC
Attorney for Defendant

> Re:  Paula Forshee v. City of East Orange
> Docket Nos. 007138-2025; 002989-2025; 002990-2025;
> 002991-2025
> Prospect Castle LLC v. City of East Orange
> Docket No. 003001-2025

Dear Counsel:

This opinion follows a reasonableness hearing in each of the above-captioned complaints, all of which were dismissed in part under N.J.S.A. 54:4-34 (commonly referred to as "Chapter 91").[1]  For the reasons stated below, the court finds that defendant's assessor's decision to carry forward the 2022 tax year assessments of

---

[1] Defendant filed identical Chapter 91 motions in all five cases.  The court decided them together and entered separate but identical orders.  The instant reasonableness hearings were also conducted together.  The court will therefore issue one opinion as to all matters since the relevant facts are the same (except for the differing dollar amounts) as is the legal issue.  The opinion will reference plaintiffs collectively in the singular.

each of the above-referenced properties (collectively "subject properties") to tax year 2025 is not unreasonable, arbitrary, or capricious. Therefore, the complaints are dismissed with prejudice.

**FACTS**

The facts are taken from the undisputed documents provided to the court during these motions and this hearing, and from the testimony of defendant's assessor, the only witness, during the hearing.

In January of 2024, Paula Forshee (the named plaintiff in four of the five matters) was appointed by the New Jersey Superior Court as Receiver for the subject properties. Each property is an apartment complex located in the City of East Orange ("City"), the defendant herein.

Plaintiff filed appeals directly to this court challenging the subject properties' assessments for tax year 2025, which were as follows:

|   | Block/Lot | Street Address | Assessment | Tax Ct. Docket Number |
|---|-----------|----------------|------------|-----------------------|
| 1 | B360; L24 | 356 William St | $1,858,800 | 002990-2025 |
| 2 | B361; L3 | 161 N. Arlington Ave | $2,771,800 | 002991-2025 |
| 3 | B580; L41 | 444-50 Prospect St | $3,456,600 | 002989-2025 |
| 4 | B660; L4 | 49 Prospect St | $6,412,800 | 007138-2025 |
| 5 | B660; L9 | 75 Prospect St | $8,489,100 | 003001-2025 |

The City then moved to dismiss each complaint under Chapter 91. By Order dated November 7, 2025, the court granted the motions in part by providing plaintiff the opportunity to challenge "the reasonableness of the assessor's valuation based

upon the data available to the assessor and the methodology used by the assessor in arriving at [the] assessment."

The court held a reasonableness hearing on two dates.[2] The City's assessor was the only witness. She testified as follows: the City underwent a district-wide revaluation effective for tax year 2022, which concluded prior to the beginning of her employment as the City's assessor in November 2022. The revaluation was conducted by a third-party entity retained by the City. The results of the revaluation were reviewed by her predecessor, the previous assessor. The limited documents in her files as to the revaluation were prepared entirely by the revaluation company, with her predecessor's changes noted therein. One set of documents was an income analysis summary for each property which was provided to the court at the end of the initial hearing.[3] Each summary had four sections as follows:

_____

[2] At the end of the initial hearing and after oral argument, plaintiff's counsel provided the court with the income analysis summaries for three of the five subject properties and asked the City's counsel to provide the court with a document she identified as Exhibit D (used during the assessor's deposition in connection with the instant hearing). The City's counsel provided the court with an Excel spreadsheet. Plaintiff's counsel advised the court that this was not the intended document since it was not used during the reasonableness hearing. The court then scheduled another date for a continuation of the hearing so plaintiff's counsel could examine the assessor as to the contents of the Excel spreadsheet. The assessor thereafter duly testified in this regard and parties' counsel proffered additional oral arguments at the end of her testimony.

[3] An income analysis summary was not available in the assessor's files for Block 580, Lot 4. The income analysis summary for Block 660, Lot 4, was incomplete in that sections 3 and 4 were missing.

3

Section 1: This included a recitation of the property's identification including a value conclusion under the cost and income approach and a line for "final value." The final value was the assessment amount (i.e., as adjusted by the previous assessor).

Section 2: This included the Income/Expense information which described:
(i)    the units (with type and bedroom count) and conclusion of the economic rent per unit (which varied depending on the number of bedrooms);
(ii)   allowance for vacancy and credit loss (4% for each property);
(iii)  allowance for operating expenses (35% for Block 660, Lot 9, and 40% for the other four properties); and
(iv)   capitalization ("Cap") rates (ranging from 7.25% to 7.85%).

Section 3: This was titled "Income Approach/Value Indications" and included computation of the net operating income, application of the Cap rate, and calculation of the "Indicated Income Value."

Section 4: This was titled "Notes" and showed the Cap rate used by the previous assessor as an "override" of the revaluation company's suggested Cap rate.

A summary of the revaluation company's Cap rates and value conclusions, the prior assessor's Cap rates, and the final values (assessments) were thus:

|   | Property | Reval. Cap Rate | Reval Value | Ass'r Cap Rate | Final Value |
|---|----------|-----------------|-------------|----------------|-------------|
| 1 | Block 360, Lot 24 | 7.50% | $ 2,193,400 | 8.85% | $1,858,800 |
| 2 | Block 361, Lot 3 | 7.50% | $ 3,270,800 | 8.85% | $2,771,800 |
| 3 | Block 580, Lot 41 | 7.85% | $ 4,023,500 | n/a (see n.3) | $3,456,600 |
| 4 | Block 660, Lot 4 | 7.65% | $ 7,464,500 | n/a (see n.3) | $6,412,800 |
| 5 | Block 660, Lot 9 | 7.25% | $11,588,300 | 9.4% | $8,489,100 |

The Excel spreadsheet, which was the subject of the assessor's testimony on the continued hearing date, included a summary of information as to each of the

subject properties.[4]   In addition to what was included in the income analysis summary,[5] the Excel spreadsheet contained the subject properties' owner's name and street address, sale details, chronological age, and their prior year's assessments. It included a value "override" column (which did not reflect any reduction in the values concluded by the revaluation company).   There were notes as to three properties as follows:

> Block 580, Lot 41:  "3sBR/bsmnt in ave cond. Zillow shows recent 2 bed 1 bath rented for $1,599"
>
> Block 660, Lot 4:  "4sBR/bsmt apt bldg. in good condition. Zillow shows a 1 bed 1 bad [sic] currently available for $1,150.  3 bed 3 bath for rent (1 month rental) for $3,575"

---

[4] Plaintiff's counsel objected to admission of the Excel spreadsheet as evidence on the grounds that the assessor's testimony of her having reviewed the appropriateness of most of the line items in the document directly contradicted her testimony at the initial hearing that she had not done so.  Plaintiff's counsel also stated that some numbers were different in the spreadsheet but did not explore these alleged differences in her examination of the assessor.  The court overruled the objection since the assessor's testimony went to her credibility which did not render the document, which was undisputedly prepared by the revaluation company, as inadmissible.

[5] The revaluation company's income analysis summary for Block 660, Lot 9, had a computational error.  It concluded an economic rent for the one 5-bedroom unit as $3,000 a month.  Instead of multiplying the same by 12 (for an annual amount), it used $3,000 as the annual rent, which made the total annual economic rent (rent for all units in the building) short by $33,000.  This error was not repeated in the Excel spreadsheet.  Thus, the total economic rent amount differed on the income analysis summary versus the Excel spreadsheet ($1,313,400 vs $1,346,400), which then produced different net operating income ($819,562 vs $840,154), and thus, different value conclusions ($11,304,300 vs $11,588,300).

Block 660, Lot 9:    "10sBR beautiful highrise in good cond. Both Apartmentguide.com and Rent.com list the units ranging between $2,200 and $3,295 (2 bed $2,200 3 bed $2,450 4 bed $2,950-$3,050 and 1-5 bed at $3,295)"

During the initial hearing date, the assessor testified that she carried forward the 2022 revaluation-based assessments (as adjusted by her predecessor) for tax years 2023 onwards for the subject properties (as she had for other properties in the City). She stressed that the revaluation was done by a reputable company, therefore, she felt she could rely on the entity's income-based valuation approach, one she said was normally used for apartment buildings, and its value conclusions, as reviewed and adjusted by the prior assessor. This was also the reason, she stated, why she did not probe into the underlying data used by the revaluation company in its income approach, for instance, how it decided the economic rents for the subject properties (surmising that it had likely used data from Costar since she did not have any of this information in her files), or the percentage for operating expense allowance. She further stated that she respected the review/changes by her predecessor, therefore she did not find the need to either discuss the reasoning or data used by the revaluation company with him or question the reason for his utilization of a different (higher) Cap rate.

Thus, she conceded that she had not reviewed or analyzed any other additional information or data, such as Chapter 91 responses received from other apartment buildings in the City, comparable rentals, or the rent-control status of the subject

6

properties, when she carried forward their prior year's assessments to tax year 2025. Nor had she checked the property record cards to confirm whether the number of units used by the revaluation company was accurate.

The assessor testified that another reason she did not find the need to change the subject properties' assessments was because plaintiff had not alerted her to any significant physical changes that were made to any of the subject properties for tax year 2025. She testified that if there had been any such changes, she would have reviewed the same to decide if an assessment change was appropriate. If there were no significant changes, she stated that she would apply the Chapter 123 ratio to the previous assessment, and if that outcome warranted a change, she would set the assessment accordingly. She testified that this was the same procedure she followed for tax year 2025, not just as to the subject properties, but to all the properties within the City. Based on the City's Chapter 123 ratio for tax year 2025, she concluded that there was no need to change the subject properties' prior year's assessments for tax year 2025.

The assessor agreed that she did not inspect any of the subject properties (exterior or interior). She stated that if plaintiff had responded to the City's Chapter 91 requests, it may have triggered an inspection, which may have resulted in a revision to the operating expense allowance used by the revaluation company (and carried forward to tax year 2025). When plaintiff inquired whether the assessor was

7

aware of permits being taken for significant rehabilitation of a parking garage for one of the properties at issue here,[6] the assessor stated that she was only aware of permits procured for repairs to an elevator sometime in October of 2024. She agreed that an increase in deferred maintenance costs could mean an increase in operating expenses. However, she noted that such costs could be passed on, resulting in a commensurate increase in rents and, thus, a property's rental income.

The assessor stated she was aware that plaintiff had provided the annual rental information to the City's Rent Control Board. However, since she did not have this document provided to her by plaintiff when she set the assessments, she did not consider the same when she carried forward the 2022 assessments. She also noted that the subject properties were not historically rent-controlled.

In response to plaintiff's questions, she confirmed that she was familiar with the New Jersey Assessor's manual (published by the Division of Taxation as the Handbook for New Jersey Assessors). When asked to confirm, per the manual, whether she is supposed to revise assessments annually, she replied that this was not an automatic exercise, especially if nothing happened to a property (i.e., it did not undergo materially significant physical changes), especially if, as here, she was not

_____

[6] Per plaintiff, it obtained a permit for the rehabilitation of a parking garage at the Block 660, Lot 9 property, which showed an estimated cost of $417,000.

advised of the same by the property owner in the context of providing Chapter 91 responses.

On the continuation date of the reasonableness hearing (as to the Excel spreadsheet, see n.2), the assessor reiterated many of her responses. For instance, when counsel for plaintiff once again questioned why certain amounts were determined to be the economic rent for a one or two-bedroom apartment for one of the properties, the assessor responded that the revaluation company set that amount. When asked for the data that was used to set the amounts, she replied that she was unaware of the same, but since the revaluation company was a reputable entity, it must have used sources such as Costar. Nor, she stated, would she speculate on why her predecessor made the changes. She reiterated that unless alerted to any material changes in the property, she would not change the prior year's assessment but would still apply the Chapter 123 ratio to decide if a change is warranted.

Unlike before, however, this time the assessor testified that she normally does review all data, including Chapter 91 responses, when setting assessments. Based on that data, she stated that she considered the rent conclusion, vacancy allowance, and operating expense allowance on the revaluation company's Excel spreadsheet as reasonable and in accordance with the existing market conditions for the City. However, she was unable to specify the data she had reviewed. She agreed that she never provided the reviewed Chapter 91 responses to plaintiff during discovery but

9

contended that she would not disseminate confidential financial information of other properties to anyone.

**ANALYSIS**

Under N.J.S.A. 54:4-34, if a property owner of an income-producing property "fail[s] or refuse[s] to respond" to an assessor's Chapter 91 request, then the assessor "shall value" that "property at such amount as [the assessor] . . . may, from any information in [the assessor's] . . . possession or available to [the assessor] . . . reasonably determine to be the full and fair value thereof."

In interpreting the above provision, the New Jersey Supreme Court held that a property owner is "entitled to" challenge the reasonableness of the assessment in a hearing which "is sharply limited in both its substantive and procedural aspects." Ocean Pines, Ltd., v. Point Pleasant Borough, 112 N.J. 1, 11 (1988). The focus of a trial court's substantive inquiry at such hearing centers on "whether the [assessed] valuation could reasonably have been arrived at in light of the data available to the assessor at the time of the valuation." Ibid. Embodied within that inquiry is: "(1) the reasonableness of the underlying data used by the assessor, and (2) the reasonableness of the methodology used by the assessor in arriving at the

10

valuation." Ibid. Thus, a matter "may be disposed . . . in summary fashion, without the taking of testimony." Id. at 11-12.[7]

In a reasonableness hearing, the court will not consider "plenary proofs as to the value of the property under appeal but only proofs as to whether the assessment imposed by the assessor was reasonable." Lucent Technologies, Inc. v. Berkeley Heights Twp., 24 N.J. Tax 297, 308 (Tax 2008). This is because the Chapter 91 statute itself "requires only that the assessor 'reasonably determine' the value of a property" based on data and information available to the assessor at the time of valuation. Id. at 312.

In this connection, "the underlying data and the methodology used by the assessor are" deemed presumptively correct. 510 Ryerson Rd., Inc. v. Borough of Lincoln Park, 28 N.J. Tax 184, 193 (Tax 2014). See also Lucent Technologies, 24 N.J. Tax at 308 ("In the context of a reasonableness hearing, the data upon which the assessor relied and the assessor's methodology are presumed to have been reasonable.").

Here, it is undisputed that the assessor carried forward the 2022 assessments set by the revaluation company, after its review and scrutiny by her predecessor, to

---

[7] In this regard, the Court noted that the "original assessment is entitled to a presumption of validity" and "to overcome that presumption, the taxpayer must produce evidence that is definite, positive and certain in quality and quantity." Ocean Pines, Ltd., 112 N.J. at 12 (citations and internal quotation marks omitted).

11

tax year 2025. She credibly testified that she did not explore or re-examine the revaluation company's valuation methodology since apartment complexes are normally valued under an income approach. She also credibly testified that she accepted the revaluation company's value conclusions and her predecessor's adjustments without any further inquiry because she relied upon their appraisal expertise and experience, which is also why she did not review any additional data in this regard, including Chapter 91 responses of similar properties in the City.[8] Her testimony was similarly credible that due to the lack of any information as to the subject properties' physical condition (other than open permits for elevator maintenance), she did not feel the need to revise their assessments. Thus, her review was limited to examining the subject properties' 2025 assessments vis-à-vis the relevant Chapter 123 ratio to see if a change was warranted. This was consistent with her procedure in carrying forward the 2022 assessments set by the revaluation company to tax years 2023 and 2024 for all properties in the City.[9]

---

[8] Her subsequent testimony that she had reviewed all data including Chapter 91 responses of all commercial properties was too general and appeared to be explaining what she as an assessor is required to do. It does not overcome her prior testimony that she did not review any Chapter 91 responses when deciding to carry forward the subject properties' prior years' assessments (which were the same since tax year 2022) to tax year 2025.

[9] Thus, the subject properties' assessments for tax years 2023 and 2024 were the same as they were for tax year 2025. Direct appeals of these assessments are pending for tax year 2024, except as to Block 660, Lot 4, for which no appeal was filed.

The court is unpersuaded by plaintiff's contention that the lack of independent review and analysis of additional or other data renders the carried-over 2025 assessments unreasonable. For one, the assessor used the available information, i.e., the summary income analysis information prepared by the revaluation company (with her predecessor's adjustments to the same) in her files. Those analyses accord with the procedures followed in determining the value of apartment buildings (such as the subject properties) when using an income approach. Plaintiff provided absolutely nothing to show the contrary. Therefore, there was nothing irrational, arbitrary, or even capricious in the assessor's decision to continue to use the same methodology used by the revaluation company. Thus, the 2025 assessments were not a product of the assessor's conjecture. Cf. Transcon. Gas Pipe Line Corp. v. Bernards Twp., 111 N.J. 507, 539 (1988) (a valuation case, where the Court determined the assessor's "methodology" to be "a perversion of proper appraisal techniques at every step of the process").[10]

The fact that the assessor was unaware of the actual data used by the revaluation company, or the propriety of using the same, does not convert the 2025 assessments as unreasonable or arbitrary. The dictionary defines "reasonable" as "fair, just, moderate, suitable under the circumstances. Fit and appropriate to the

---

[10] This case was also cited in a Chapter 91 reasonableness context, as an example of an "aberrant methodology that dispelled the presumption of correctness of" an assessment. See Ocean Pines, Ltd., 112 N.J. at 12.

end in view . . . rational . . . . Not immoderate or excessive." Black's Law Dictionary 1138 (5th ed. 1979). See also Webster's Third New International Dictionary 1892 (3d ed. 1993) ("reasonable" means "not conflicting with reason; not absurd; not ridiculous; being or remaining within the bounds of reason; not extreme; not excessive"). Thus, commonsensically, the word "unreasonable" means "irrational; foolish; unwise; absurd; silly; preposterous; senseless; stupid," or "immoderate; exorbitant;" or "capricious; arbitrary; confiscatory." Black's Law Dictionary 1379 (5th ed. 1979).

As noted above, the Excel spreadsheet prepared by the revaluation company did reflect the data source for setting the rental income for three of the subject properties. This was the information that was available to the assessor and in her possession when she set the subject properties' 2025 assessments. Indeed, the Chapter 91 statute itself allows the assessor to rely upon "any" information that is in the possession of, or available to the assessor. As such, reliance on this information, which was only three years old, was not unreasonable nor does it render the assessments as being unreasonable. As noted by this court, "[h]iring an experienced valuation firm to collect data on properties and make recommendations of value to an Assessor who subsequently independently reviews and scrutinizes this information before making an assessment is eminently reasonable." 510 Ryerson Rd., Inc., 28 N.J. Tax at 196.

Plaintiff failed to show (for instance, by proffering testimony of a member of the revaluation company) that the City's assessor's reliance on the revaluation company's conclusions was unreasonable because the underlying data was so flawed or distorted that the 2022 assessments were patently unreasonable, therefore, carrying them forward rendered the 2025 assessments equally unreasonable. Plaintiff also did not show (or even allege) that the quantum of assessment was outrageous. See e.g. Ocean Pines v. Point Pleasant Borough, 213 N.J. Super. 351, 355 (App. Div. 1986) (setting an assessment at "10 times [the property's] . . . purchase price" would undoubtedly result in a violation of the reasonable standard required by the Chapter 91 statute).[11] While a "taxpayer should be able to assert that the data used by the assessor did not reasonably justify the results reached," ibid., it is the taxpayer's burden to prove that assertion. The assessor is not obliged to prove that their assessment was reasonable or reasonably based on market data.

There is no question that an assessor must annually set assessments based on a review of data. N.J.S.A. 54:4-23. However, the fact that here, the assessor's review was to carry forward the 2022 assessments (after testing the same with the

---

[11] In Ocean Pines, the court noted that if there is a "significant disparity" in an assessment, "failure to apply" the Chapter 123 ratio can "cause an overvaluation of the property." 213 N.J. Super. at 355. Therefore, a taxpayer should be able to explore the "failure to apply the common ratio where it results in a substantial variation" in a reasonableness hearing. Ibid. Here, it is undisputed that the assessor tested the subject properties' 2025 assessments with the City's Chapter 123 ratio.

Chapter 123 ratio) to tax year 2025, does not serve as prima facie evidence that the 2025 assessments were arbitrary or capricious or are per se unreasonable. See e.g. 510 Ryerson Rd., Inc., 28 N.J. Tax at 196 (assessment is not unreasonable where assessor did not "independently verify" information on rents or personally inspect the property, but adopted values recommended by the revaluation company under an income approach); Waterside Villas Holdings, LLC v. Monroe Twp., 434 N.J. Super. 275, 279 (App. Div. 2014) (rejecting taxpayer's appeal of the Tax Court's conclusion that an assessment based on an income approach was not unreasonable and arbitrary simply because the assessor did not review market rents at the time of the assessment and carried forward the prior year's assessment). Thus, carrying a prior year's assessment to the next year is not an inherent aberration such that the carried-forward assessment is also an aberration.

That the revaluation company's data may be somewhat stale by three years, or that the vacancy allowance or operating expense allowance needed some modification or revision, without more, only indicates that the 2025 assessments may be inaccurate or flawed. It does not prove, or even tend to prove, that those 2025 assessments were unreasonable or irrational.

The same conclusion applies to plaintiff's contention that the assessor failed to inspect the subject properties and therefore, the assessments are unreasonable. The assessor credibly testified that she was not aware of any specific significant or

16

material changes made to any of the properties, other than being aware of a permit taken out for elevator maintenance for one of the buildings. Plaintiff's assertion that significant repairs were undertaken to a garage in one of the subject properties with permits taken out for the same, does not shift the burden to the assessor to prove that the assessments were reasonable. Plaintiff did not provide any information to show that the permit(s) was/were closed out, i.e., that a significant rehabilitation was completed by the assessment date, or during tax year 2025, and if so, how that cost would convert into a credible and significant value change rendering the assessment for that property as an aberration.

Similarly, the fact that the assessor was aware of annual rentals being filed by plaintiff to the City's rent control board does not render her assessments for 2025 excessively distorted or blatantly incorrect as to either data or methodology used by the revaluation company. Plaintiff was required to provide this information in response to the assessor's Chapter 91 requests. Not having done so, plaintiff cannot credibly now claim that the assessor was derelict in not actively obtaining the rental information from the rent control board, rendering her assessments arbitrary and capricious. See Ocean Pines, 112 N.J. at 11 ("taxpayer's failure to provide the requested financial information in a timely fashion will preclude the use of those data on appeal"). Plaintiff did not proffer any credible proof as to when one of the subject properties became rent-controlled, did not explain how or why a rent-

17

controlled property should not use an income approach as a valuation methodology, and did not demonstrate how or why the rental income conclusion for tax year 2025 was absurdly excessive.

It is plaintiff's burden to demonstrate to the court that the assessments were egregious or that the assessor's selection of data or her assessment methodology was arbitrary or capricious, by "definite, positive" proof which is "certain in quality and quantity." Lucent Technologies, 24 N.J. Tax at 311. Plaintiff fails in this regard. Other than proffering evidence that the assessor carried forward the 2022 assessments without conducting an independent income analysis or data review on October 1, 2024, plaintiff did not show that the income approach is an inappropriate valuation methodology for the subject properties (which are apartment buildings), or that the data underlying the 2022 revaluation company's value conclusions were aberrant, or that the previous assessor's use of a higher Cap rate was irrational.

**CONCLUSION**

Plaintiff has not overcome the presumptive reasonableness of the carried forward assessments. The court finds no justifiable basis to sustain plaintiff's contentions that the subject properties' assessments for tax year 2025 were based on the assessor's use of an unreasonable, arbitrary, or capricious valuation methodology or data. The complaints are therefore dismissed with prejudice.

_____/s/ Mala Sundar_____
Hon. Mala Sundar, P.J.T.C.
